1

2

3

4

5

6

7

8              **IN THE UNITED STATES DISTRICT COURT**

9              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    HALEY J. FILLMORE,                          No.  2:20-CV-1599-DMC

12              Plaintiff,

13        v.                                       MEMORANDUM OPINION AND ORDER

14    COMMISSIONER OF SOCIAL
      SECURITY,
15
                Defendant.
16

17

18              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19    review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20    Pursuant to the written consent of all parties, ECF Nos. 6 and 8, this case is before the

21    undersigned as the presiding judge for all purposes, including entry of final judgment.  See 28

22    U.S.C. § 636(c).  Pending before the Court are the parties' briefs on the merits, ECF Nos. 16 and

23    17.

24              The Court reviews the Commissioner's final decision to determine whether it is:

25    (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

26    whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

27    more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

28    (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support

                                               1

1   a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 402 (1971).  The record as a whole,

2   including both the evidence that supports and detracts from the Commissioner's conclusion, must

3   be considered and weighed.  <u>See Howard v. Heckler</u>, 782 F.2d 1484, 1487 (9th Cir. 1986); <u>Jones</u>

4   <u>v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985).  The Court may not affirm the Commissioner's

5   decision simply by isolating a specific quantum of supporting evidence.  <u>See Hammock v.</u>

6   <u>Bowen</u>, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

7   findings, or if there is conflicting evidence supporting a particular finding, the finding of the

8   Commissioner is conclusive.  <u>See Sprague v. Bowen</u>, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

9   Therefore, where the evidence is susceptible to more than one rational interpretation, one of

10   which supports the Commissioner's decision, the decision must be affirmed, <u>see Thomas v.</u>

11   <u>Barnhart</u>, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

12   standard was applied in weighing the evidence, <u>see Burkhart v. Bowen</u>, 856 F.2d 1335, 1338 (9th

13   Cir. 1988).

14           For the reasons discussed below, the matter will be remanded for further

15   proceedings.

16

17               **I.  THE DISABILITY EVALUATION PROCESS**

18           To achieve uniformity of decisions, the Commissioner employs a five-step

19   sequential evaluation process to determine whether a claimant is disabled.  <u>See</u> 20 C.F.R. §§

20   404.1520 (a)-(f) and 416.920(a)-(f).   The sequential evaluation proceeds as follows:

21           Step 1       Determination whether the claimant is engaged in
22                        substantial gainful activity; if so, the claimant is presumed
                         not disabled and the claim is denied;

23           Step 2       If the claimant is not engaged in substantial gainful activity,
                         determination whether the claimant has a severe
24                        impairment; if not, the claimant is presumed not disabled
                         and the claim is denied;
25
             Step 3       If the claimant has one or more severe impairments,
26                        determination whether any such severe impairment meets
                         or medically equals an impairment listed in the regulations;
27                        if the claimant has such an impairment, the claimant is
                         presumed disabled and the claim is granted;
28

2

| | | |
|---|---|---|
| Step 4 | | If the claimant's impairment is not listed in the regulations, determination whether the impairment prevents the claimant from performing past work in light of the claimant's residual functional capacity; if not, the claimant is presumed not disabled and the claim is denied; |
| Step 5 | | If the impairment prevents the claimant from performing past work, determination whether, in light of the claimant's residual functional capacity, the claimant can engage in other types of substantial gainful work that exist in the national economy; if so, the claimant is not disabled and the claim is denied. |

See 20 C.F.R. §§ 404.1520 (a)-(f) and 416.920(a)-(f).

To qualify for benefits, the claimant must establish the inability to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted, or can be expected to last, a continuous period of not less than 12 months. See 42 U.S.C. § 1382c(a)(3)(A). The claimant must provide evidence of a physical or mental impairment of such severity the claimant is unable to engage in previous work and cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. See Quang Van Han v. Bower, 882 F.2d 1453, 1456 (9th Cir. 1989). The claimant has the initial burden of proving the existence of a disability. See Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

The claimant establishes a prima facie case by showing that a physical or mental impairment prevents the claimant from engaging in previous work. See Gallant v. Heckler, 753 F.2d 1450, 1452 (9th Cir. 1984); 20 C.F.R. §§ 404.1520(f) and 416.920(f). If the claimant establishes a prima facie case, the burden then shifts to the Commissioner to show the claimant can perform other work existing in the national economy. See Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988); Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); Hammock v. Bowen, 867 F.2d 1209, 1212-1213 (9th Cir. 1989).

/ / /

/ / /

/ / /

/ / /

3

1

## II.  THE COMMISSIONER'S FINDINGS

2          Plaintiff applied for social security benefits on April 30, 2014.  <u>See</u> CAR 26.[1]  In

3   the application, Plaintiff claims disability began on August 1, 2013.  <u>See id.</u>  Plaintiff's claim was

4   initially denied.  Following denial of reconsideration, Plaintiff requested an administrative

5   hearing, which was held on March 31, 2016, before Administrative Law Judge (ALJ) Christopher

6   C. Knowdell.  In an April 26, 2016, decision, the ALJ concluded Plaintiff is not disabled based on

7   the following relevant findings:

8
                    1.      The claimant has the following severe impairment(s): personality
9                           disorder; depression; and bipolar disorder;

10                   2.      The claimant does not have an impairment or combination of
                            impairments that meets or medically equals an impairment listed in
11                          the regulations;

12                   3.      The claimant has the following residual functional capacity: a full
                            range of work at all exertional levels; she is capable of simple
13                          routine tasks not at a production rate pace, but still capable of
                            meeting end of day goals; capable of occasional superficial
14                          interactions with public and superficial interactions with
                            coworkers;

15                   4.      Considering the claimant's age, education, work experience,
16                          residual functional capacity, and vocational expert testimony, there
                            are jobs that exist in significant numbers in the national economy
17                          that the claimant can perform.

18          <u>See id.</u> at 28-35.

19          After the Appeals Council declined review on October 16, 2017, Plaintiff filed a

20   prior action for judicial review in this Court, <u>Fillmore v. Berryhill</u>, 2:17-CV-2470-DB.  Following

21   briefing on the merits, the matter was remanded for further administrative proceedings.  <u>See</u> CAR

22   378-84.  Pursuant to the District Court's remand order, the agency issues an order on April 10,

23   2019, directing that the case be referred for further administrative proceedings before an ALJ.

24   <u>See id.</u> at 386-87.  In that order, the agency noted that Plaintiff had filed a subsequent claim on

25   January 31, 2018, which was duplicative of the original claim in light of further proceedings on

26

27   _____

28   [1]      Citations are to the Certified Administrative Record (CAR) lodged on March 23,
     2021, ECF No. 11.

that claim ordered by the District Court.  See id.  The ALJ was directed to issue a single new

decision on the consolidated claims.  See id.

　　　　A second administrative hearing was held on May 26, 2020, before the same ALJ.

See id. at 327.  At the second hearing, Plaintiff alleged a closed period of disability from August

1, 2013, through April 1, 2019.  See id. (citing Exhibit 28E).  In a June 10, 2020, decision, the

ALJ concluded Plaintiff is not disabled based on the following relevant findings:

　　1.　　The claimant has the following severe impairment(s): borderline personality disorder; depression; bipolar disorder; post-traumatic stress disorder (PTSD); oppositional defiance disorder; and attention-deficit hyperactivity disorder (ADHD);

　　2.　　The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;

　　3.　　The claimant has the following residual functional capacity: a full range of work at all exertional levels; she could understand, remember, and apply simple instructions; she could maintain concentration, persistence, or pace for simple repetitive tasks; she could occasionally engage in superficial interactions with the public, co-workers, and supervisors; she should avoid proximity to co-workers and overly close supervision; the claimant could adapt to routine workplace changes with simple decisions;

　　4.　　Considering the claimant's age, education, work experience, residual functional capacity, and vocational expert testimony, there were jobs that existed in significant numbers in the national economy that the claimant could have performed during the closed period of alleged disability.

See id. at 329-44.

After the Appeals Council declined further review, the current appeal followed.

## III. DISCUSSION

　　　　In her opening brief, Plaintiff raises one argument – the ALJ erred in rejecting her

statements and testimony concerning symptoms and limitations.  The Commissioner determines

the weight to be given to a claimant's testimony and statements, and the Court defers to the

Commissioner's discretion if the Commissioner used the proper process and provided proper

reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit finding must be

supported by specific, cogent reasons.  See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir.

1    1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).

2    Rather, the Commissioner must identify what testimony is given weight and what evidence

3    undermines the testimony.  See id.  Moreover, unless there is affirmative evidence in the record of

4    malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear

5    and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir.

6    2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart,

7    464 F.3d 968, 972 (9th Cir. 2006)).

8          If there is objective medical evidence of an underlying impairment, the

9    Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

10   because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

11   341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

12              The claimant need not produce objective medical evidence of the
13   [symptom] itself, or the severity thereof.  Nor must the claimant produce
     objective medical evidence of the causal relationship between the
14   medically determinable impairment and the symptom.  By requiring that
     the medical impairment "could reasonably be expected to produce" pain or
15   another symptom, the Cotton test requires only that the causal relationship
     be a reasonable inference, not a medically proven phenomenon.

16   80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
17   Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

18         The Commissioner may, however, consider the nature of the symptoms alleged,

19   including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,

20   947 F.2d at 345-47.  In weighing a claimant's statements and testimony, the Commissioner may

21   also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other

22   inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to

23   follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and

24   (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See

25   Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

26   claimant cooperated during physical examinations or provided conflicting statements concerning

27   drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

28   claimant testifies as to symptoms greater than would normally be produced by a given

6

1    impairment, the ALJ may disbelieve that testimony provided specific findings are made. <u>See</u>

2    <u>Carmickle</u>, 533 F.3d at 1161 (citing <u>Swenson v. Sullivan</u>, 876 F.2d 683, 687 (9th Cir. 1989)).

3          The ALJ provided the following summary of Plaintiff's statements and testimony:

4          The claimant alleges on her Disability Report in March 2018 that she

5          struggles with bipolar disorder, borderline personality disorder, and anxiety (Exhibit 19E).

6          In April 2018, a Function Report completed by the claimant indicated that

7          she could not handle social interaction and struggled with mood swings, hopelessness, suicidal thoughts, and helplessness due to depression. The

8          claimant indicated that she sometime[s] has problems with personal care, cooking, and doing household chores due to depression. The claimant

9          reported that she tries to go outside often but struggles with fear of socializing with others. The claimant indicated that she is capable of

10        driving and shopping depending on her mood but has highs and lows when shopping. The claimant indicated that she spends time with her family

11        and close friends; she goes to her doctor's appointments when reminded. The claimant reported that her condition affects her memory,

12        concentration, and understanding and her ability to talk, complete tasks, follow instructions, and get along with others (Exhibit 21E).

13          CAR 332-33.

14          The ALJ added the following regarding Plaintiff's hearing testimony:

15          At the hearing in 2016, the claimant testified that she struggled with anger

16          issues and was not capable of dealing with people. However, she was able to attend college full-time and obtain a BS in Sociology in 2015 from

17          Sacramento State University. The claimant indicated that her GPA was 3.7 but she had some difficulty concentrating at school and at home but

18          she continued to take three to six additional hours to complete school assignments (Exhibit 5F/17). The claimant testified to no formal

19          accommodations other than going to her professors with a doctor's note that allowed her to sit at the front of her lectured class. The claimant

20          testified that she does not like to go to the store and shop, but she can interact with someone to buy items. The claimant indicated that she has

21          two close friends, which suggest[s] some ability to handle social interactions.

22          At a subsequent hearing in May 2020, the claimant testified that she has

23          returned to work, working part-time as a behavioral therapist aid, working with autistic children. The claimant indicated that she had been applying

24          for jobs since she graduated from college.

25          However, the claimant testified that she was not able to work from 2013 through 2018 because she was not able to socially deal with others. The

26          claimant indicated that she use[d] to have a lot of road rage, could not focus, and lashed out on others. The claimant also reported that she could

27          not handle change but she can now; she struggled with mood swings. The claimant testified that she would sit in her classroom and could not

28          remember anything due to her memory and concentration problems. The

claimant requested a closed period of disability from August 1, 2013, through April 1, 2019.

CAR 333.

The ALJ also summarized a third-party report submitted by Plaintiff's mother, Ms. Denise Binford:

A Third Party Function Report completed by the claimant's mother Ms. Denise Binford indicated that the claimant was combative, aggressive, and unable to follow directions. The claimant struggles with highs and lows, which affects her functionality due to depressive episodes. The claimant sometimes [has] problems with personal care due to depression. The claimant is capable of cooking simple meals but need[s] help completing household chores. The claimant rarely goes outside; she is capable of driving and shopping but she took the claimant's credit card because of her excessive spending. Th claimant socializes with people that come[] to her house to visit and she is capable of going to her doctor's appointment but with constant reminders. The claimant's condition affects her ability to sit, hear, and see, and affects her memory, concentration, understanding, completing tasks, following instructions, and getting along with others (Exhibit 22E).

CAR 333.

In evaluating the weight to be given Plaintiff's statements and testimony, the ALJ first engaged in a detailed comparison of Plaintiff's statements and testimony to the longitudinal medical record. The ALJ stated:

. . . In May 2014, her mental status examination revealed fair eye contact, cooperative attitude, poor energy, dysphoric mood, normal affect, linear thought process, adequate insight, fair judgment, fair memory but poor remote memory, and grandiose thought content. Diagnoses were type I bipolar disorder and oppositional defiant disorder. The claimant was oriented to person, place, and situation (Exhibit 2F/3-4).

From May 2014 through December 2014, the records showed that the claimant continued to receive treatment from Sacramento Mental Health (Exhibits 3F- 4F). Her mental status examinations revealed depressed mood, pressured speech, normal eye contact but was intermittently tearful, impaired/fair insight and judgment, and intact cognition in June 2014; otherwise, her mental status examination was within normal limits, except for slightly pressured speech in December 2014 (Exhibits 3F/2; 4F/1; 5F/17). Diagnoses were borderline personality disorder and bipolar disorder, and mood disorder (Exhibits 3F/2, 4F/12).

Progress notes also documented that she was not taking any psychotropic medication and the treating source prescribed medication in June 2014 and changed it in July 2014 (Exhibits 3F/1, 4F/2). In July 2014, the claimant reported that she struggled with mood swings, racing thoughts, and

hopelessness but she was one year away of finishing her BA at Sacramento State University; she is majoring in Sociology and minoring in Psychology, and planning to go into family law (Exhibit 4F/1). In December 2014, the claimant reported that she was doing better in school; she has life goals, and understands the steps she needs to take in order to complete her objective (Exhibit 5F/18).

January 2015, the claimant reported "doing well," feeling overall better and more confident (Exhibit 5F/15). Her mental status examination revealed good eye contact, slightly pressured speech, anxious affect, and slightly disorganized thought process. The treating source noted that the claimant was improving with psychotropic medication (Exhibit 5F/15-16). In April 2015, the claimant stated that her medications were working well, helping her with her mood swings, anger outbursts, impulsivity, and she was taking them consistently. She reported maintaining two close friendships. Her mental status examination was within normal limits (Exhibit 5F/13-14).

In May 2015, the claimant reported that she continued to enjoy college and was doing well in her classes (Exhibit 5F/11). The treating source noted that medication controlled her borderline personality disorder and mood disorder (Exhibit 5F/12). In June 2015, the claimant reported that she was looking forward for graduation; she has a 3.7 GPA for five classes and she enjoys spending time with her two-year old son; she has maintain good relationship with her mother and the father of her son. Her mental status examination was within normal limits (Exhibit 5F/9-10).

In September 2015, the claimant reported that she stopped taking Geodon because she felt very sleepy with the medication, and her sleepiness interfered with her driving and her concentration in class. Her mental status examination was within normal limits; she was alert and cooperative and started on a new medication (Exhibit 5F/7).

In November 2015, her mental status examination was within normal limits, except for depressed/anxious mood and spontaneous speech. The treating source noted that the claimant's symptoms were poorly controlled on her current dose of Risperidone, and thus, increased her medication doses (Exhibit 5F/5-6).

However, in January 2016, the claimant reported that the increased medication controlled her symptoms and she was functioning better. Her mental status examination was within normal limits. The treating source noted that the claimant was doing well on Risperidone and she overall improved. Diagnoses were mood disorder NOS, borderline personality disorder, and a GAF of 66 (Exhibits 5F/3-4; 6F/4-5).

In April 2016, progress notes from Sacramento Mental Health documented that the claimant has a history of mood disorder NOS and borderline personality disorder. The claimant missed several appointments since January 2016; the claimant reported that she ran out of psychotropic medications in March 2016 and had not taken medication for two weeks. The claimant also reported that she graduated from Sacramento State in December 2015 and plans to pursue a degree in law (Exhibit 6F/1). Her mental status examinations were within normal limits and the claimant indicated that her plans are to stabilize her symptoms prior to applying for

jobs. The claimant endorsed that Risperidone controls her symptoms; therefore, treating psychiatrist Dr. Puja Chadha indicated that the claimant should continue with her medication (Exhibit 6F/2).

On July 13, 2016, her mental status examination was within normal limits, except for slightly rushed speech. Dr. Chadha restarted the claimant on Risperidone (Exhibit 9F/5).

On August 16, 2016, the claimant reported that she started cutting herself and was getting into verbal altercations since being off psychotropic medications for the past two months but she is trying to get back on her psychotropic medications. The claimant also indicated that she has being going to counseling for a while and it helps her stay well. Her mental status examination was within normal limits, except for fair memory and judgment. Diagnoses were borderline personality disorder, mood disorder NOS, and a GAF of 60 (Exhibits 7F/1, 3, 5; 16F/17).

On September 26, 2016, Dr. Chadha indicated that the claimant has been off her medication for the past one and a half weeks to two weeks. The claimant reported that she ran out of medication and was unable to go to the clinic. Dr. Chadha noted that the medication works well, when she takes it (Exhibit 9F/1). Her mental status examination revealed good eye contact, appropriate affect, normal speech, and normal mood; the theme was restarting her medication for mood stability. Diagnoses were type II bipolar disorder and borderline personality disorder (Exhibit 9F/2).

On October 12, 2016, the claimant reported that she was not compliant with medication and she enjoys her outpatient therapy with her counselor (Exhibit 10F/3). Her mental status examination was within normal limits (Exhibit 10F/4). On November 14, 2016, the claimant did not attend her appointment and the office gave her a reminder call (Exhibit 10F/5-6). On November 22, 2016, the claimant reported that she does not take her medication, maybe "three times a month or so" and declined in making medication adjustment. Her mental status examination was normal, except for fair judgment and somewhat down mood (Exhibit 10F/9-10).

On December 8, 2016, the claimant indicated that she missed her appointment because she overslept (Exhibit 10F/12). The claimant missed her appointments in January 2017 (Exhibit 10F/14-20). On February 22, 2017, the claimant reported that she is on a low dose of Risperdal and was happy. Her mental status examination was within normal limits (Exhibit 10F/22-23).

The claimant missed her appointments in March 2017 (Exhibit 10F/25-29). On April 5, 2017, her mental status examination was within normal limits, except for slightly disheveled hair (Exhibit 10F/31). The claimant missed the remainder of her appointments from April 2017 through May 2017 (Exhibit 10F/33-39). However, during her psychotherapy session on May 17, 2017, the claimant reported that she was depressed due to not being able to get pregnant. Her mental status examination was within normal limits (Exhibit 16F/34).

/ / /

/ / /

On June 5, 2017, her mental status examination was normal, except for spontaneous speech. The claimant reported that she started smoking cannabis to help her relax. Dr. Chadha increased her medication (Exhibit 10F/40-41). On July 1, 2017, the claimant reported that her mood was more stable on her current medication. Her mental status examination was within normal limits, except for spontaneous speech (Exhibit 10F/45-46). From July 3, 2017 through October 11, 2017, the claimant missed her doctor's appointments (Exhibit 10F/48-56).

During psychotherapy on September 13, 2017, the claimant reported that things are "good" and she was eight weeks pregnant; she was excited and happy. Her mental status examination was within normal limits (Exhibit 16F/44). On October 13, 2017, the claimant reported that she was not taking any psychotropic medication due to her pregnancy. The claimant indicated that her estimated due date is in April 2018. Her mental status examination was normal, except for spontaneous speech (Exhibit 10F/57-58).

On December 1, 2017, the claimant reported that she was currently looking for jobs and received some interviews. However, she was optimistic that she will achieve employment and she was still not taking any psychotropic medication due to her pregnancy. Her mental status examination was normal. Dr. Russell Lim noted that the claimant continues to see her therapist regularly, checks in with APSS, and uses methods to deal with anxiety and mood swings (Exhibit 10F/67-68).

On January 26, 2018, the claimant reported that she was doing well but had some anxiety. Her mental status examination was within normal limits, except she was slightly anxious. Dr. Lim noted that the claimant could take low dose of psychotropic medications for her anxiety but the claimant does not want to take medications at this time due to pregnancy (Exhibit 10F/71-72). On March 13, 2018, the claimant reported that she was happy due to her planned pregnancy and denied having panic attacks but endorsed having some anxiety. Her mental status examination was within normal limits (Exhibit 10F/77-78).

On March 30, 2018, an interviewer from the Field Office observed and noted that the claimant had no problems with understanding, coherency, concentrating, talking and answering questions. The claimant did not exhibit any signs of delay or difficulty in her attention or focus (Exhibit 17E).

On June 18, 2018, the claimant reported that she is not taking psychotropic medication because she is adjusting to being a single parent of two children. Her mental status examination was normal (Exhibit 12F/83-84). On August 8, 2018, the claimant reported that she was breastfeeding and was not currently taking any psychotropic medications. The claimant indicated that she was doing fairly well and her mood has been very stable with caring for her newborn. Her mental status examination was normal (Exhibit 12F/88-89).

/ / /

/ / /

On November 27, 2018, the claimant reported that she was not taking any psychotropic medications while breastfeeding but was doing well. Her mental status examination was normal (Exhibit 12F/95-96).

On January 10, 2019, the claimant reported that she is not taking medications and prefers to hold off on psychotropic medications and feels that breastfeeding helps her mood. Her mental status examination was normal (Exhibit 12F/100-101). On March 27, 2019, her mental status examination was within normal limits (Exhibit 12F/105).

On June 30, 2019, the claimant indicated that she was not taking psychotropic medication at this time. The claimant also reported that she is weaning from breastfeeding due to resuming working. The claimant asked about clarifying her diagnoses including, "no longer meeting borderline personality disorder because her prominent issue is struggling with interactions of trauma. The claimant that she has intermittent impulses but her impulses are fleeting and she is able to "think things through." The claimant stated that she would explore resuming Risperdal for her symptoms but denied anger outburst and feel supported by her mother (Exhibit 12F/112).
Her mental status examination was within normal limits. Diagnoses were posttraumatic stress disorder, borderline personality disorder, panic disorder, and type II bipolar disorder by history (Exhibit 12F/113). Psychiatrist Dr. Puja Chadha prescribed Risperdal for the claimant to restart (Exhibit 12F/114).

On August 13, 2019, the claimant reports that she has not needed to take her psychotropic medication; she has been feeling well, although, she has episodes of getting overwhelmed but was able to walk away for the situation. The claimant attributed her episodes of feeling overwhelmed to having multiple different responsibilities in her life, including a part-time job as an ABA therapist, caring for two children, and caring for her mother. She reported that she is doing well at her job despite occasional internal conflicts between the strict ABA guidelines. The claimant reported that she has a good relationship with her new case manager and meet with her every two weeks (Exhibit 12F/116). Her mental status examination was normal and has appropriate ways of coping with stress. Treating psychiatrist Dr. Chadha noted that the claimant has been using her coping skills instead of medications (Exhibit 12F/117).

On December 30, 2019, treating psychiatrist Dr. Chadha indicated that the claimant's examination was within normal limits; she was able to follow the flow of conversation with good attention. The claimant is able to work, perform self-care and care for the needs of her children. The claimant has excellent social functioning skills, excellent concentration, and excellent adaptation to work. Dr. Chadha noted that the claimant has significantly progressed since 2014 and has benefitted from therapy and medications (Exhibit 17F/4-7).

CAR 334-38.

/ / /

/ / /

1          The ALJ next compared Plaintiff's statements and testimony to the various

2  medical opinions in the record.  The ALJ stated:

3          . . . Dr. Larry Kravitz in July 2014 from the State agency determined that
           the claimant could perform simple instructions and some detailed
4          instructions; the claimant is limited to superficial interaction with others
           and no overly close supervision or working in close proximity to others
5          (Exhibit 1A/6-8). Dr. Randall Garland in October 2014 from the State
           agency affirmed Dr. Kravitz' medical opinions (Exhibit 3A/6-8).
6
           On September 14, 2016, a mental medical source statement completed by
7          Dr. P. Chadha indicated that the claimant's ability to maintain attendance
           during a workday or workweek, maintain consistent pace, interact with the
8          public and coworkers, and respond to changes in a routine setting were
           markedly limited (Exhibit 8F/1). However, the claimant needs to engage
9          in therapy more consistently and take her medications more regularly for
           full benefits and better stabilization to help improve limitations and her
10         ability to work (Exhibit 8F/5).

11         On May 23, 2018, Dr. Joshua Boyd from the State agency determined that
           the claimant could perform simple routine tasks with no public interaction
12         and could occasionally interact with coworkers and supervisors. The
           claimant is able to adapt and respond appropriately to changes in a
13         simple routine work setting (Exhibit 14A/7-9).

14         On March 14, 2019, psychiatrist Dr. Chadha indicated that the claimant
           could perform simple tasks and make simple judgments on simple work-
15         related decisions; the claimant's ability to perform work on a consistent
           basis, interact with the public and co-workers, and respond appropriately
16         to changes in a routine setting were moderately limited. The claimant's
           ability to interact appropriately with supervisors were markedly limited
17         (Exhibit 11F/2-3). Dr. Chadha indicated that the claimant was not taking
           any medications due to breastfeeding but recommend that the claimant
18         could return to work, working part-time in a low stress environment
           (Exhibit 11F/6-7).
19
           On December 23, 2019, a mental assessment completed by treating
20         psychiatrist Dr. Chadha indicated that the claimant is currently performing
           exceptionally and would not have any problems understanding simple or
21         complex instructions. The claimant is able to respond to supervision,
           coworkers, and work pressures in a work setting. The claimant would need
22         to coordinate and distance herself from situations, which she is handling
           well with good self-awareness (Exhibit 17F/1-3).
23
           On May 11, 2020, a mental assessment completed by treating psychiatrist
24         Dr. Chadha indicated that the claimant is able to understand, remember,
           and carry out simple and detailed instructions; the claimant has slight
25         problems interacting with supervisors, co-workers, and the public and
           responding appropriately to changes in a routine work setting. The
26         claimant is consciously working on how to adapt better. Her mental status
           examination was normal; the claimant is a single successful caregiver for
27         two children, working, and independent of activities of daily living
           (Exhibit 20F).
28

As stated earlier, medical expert Dr. Layton opined that the claimant has moderate limitations in understanding, remembering or applying information, interacting with others, maintaining concentration, persistence, or pace, and adapting or managing oneself because of her inconsistency with medications. Dr. Layton indicated that the claimant is now working a high stress job, working with autistic children. Dr. Layton recommended simple routine work with minimum changes and occasional superficial interaction with others; the claimant is able to complete projects on her own but not with a team. During the timeframe of 2013-2019, Dr. Layton indicated that the claimant did not struggle with regular attendance at Sacramento State University.

CAR 338-39.

Finally, the ALJ considered Plaintiff's subjective complaints pursuant to Social Security Ruling (SSR) 16-3p:

The undersigned now considers the claimant's subjective complaints as required by the Regulations and Social Security Ruling of SSR 16-3p, noting that the claimant testified in 2016, the claimant testified that she struggled with anger issues and was not capable of dealing with people. The claimant testified in May 2020 that she has returned to work, working part-time as a behavioral therapist aid, working with autistic children. The claimant indicated that she has been applying for jobs since she graduated from college.

Regarding the claimant's testimony in 2016 of not being capable of dealing with people, the claimant reported in July 2014 that she struggled with mood swings, racing thoughts, and hopelessness but she was one year away of finishing her BA degree at Sacramento State University. The claimant indicated that she was majoring in Sociology and minoring in Psychology, and planning to go into family law (Exhibit 4F/1).

The records also showed that she was able to attend college full-time and obtain her BS in Sociology in 2015 from Sacramento State University. The claimant indicated that her GPA was 3.7; although, she had some difficulty concentrating at school and at home but she continued to study three to six additional hours to complete school assignments. In May 2015, the claimant reported that she continues to enjoy college and was doing well in her classes (Exhibit 5F/9-11, 17).

In January 2016, the claimant reported that the increased medication controlled her symptoms and she was functioning better. Her mental status examination was within normal limits (Exhibits 5F/3-4; 6F/4-5).

From April 2016 through December 2016, the medical evidence showed that she missed many of psychiatric doctor's appointments and was not consistent with her psychotropic medication (Exhibits 6F; 10F). In September 2016, treating psychiatrist Dr. Chadha indicated that the claimant has been off her medication for the past one and a half weeks to two weeks. Dr. Chadha noted that the medication works well, when she takes it (Exhibit 9F/1). During her examination, the theme was restarting her medication for mood stability (Exhibit 9F/2). In November 2016,

the claimant reported that she does not take her medication, maybe "three times a month or so" and declined in making medication adjustment (Exhibit 10F/9-10).

From March 2017 through March 2018, the records continued to document that the claimant missed many doctor's appointments; she was inconsistent with psychotropic medication and eventually stopped taking psychotropic medication due to pregnancy (Exhibits 10F/25-29, 33-39, 40-41, 45-46, 48-56, & 71-72). In September 2017, the claimant reported that she was excited about being pregnant. Her mental status examination was within normal limits (Exhibit 16F/44).

In October 2017, the claimant reported that she was not taking any psychotropic medication due to her pregnancy (Exhibit 10F/57-58). In December 2017, the claimant reported that she was currently looking for jobs and received some interviews; she was optimistic that she would achieve employment (Exhibit 10F/67-68). In March 2018, the claimant reported that she was happy due to her planned pregnancy and denied having panic attacks (Exhibit 10F/77-78).

From June 2018 through November 2018, the claimant reported that she was not taking any psychotropic medication due to breastfeeding her baby. The claimant indicated that she was doing fairly well and her mood has been very stable with caring for her newborn. Her mental status examination was normal (Exhibit 12F/83-84, 88-89, 95-96).

From January 2019 through March 2019, the claimant reported that she is not taking medications; she prefers to hold off on psychotropic medications because breastfeeding was helping her mood. Her mental status examination was normal (Exhibit 12F/100-101, 105).

In June 2019, the claimant indicated that she was not taking psychotropic medication at this time. Her mental status examination was within normal limits and treating psychiatrist Dr. Chadha prescribed Risperdal for the claimant to restart (Exhibit 12F/112-114).

However, the claimant reported in August 2019 that she has not needed to take her psychotropic medication because was feeling well, although, she has had episodes of getting overwhelmed but she was able to walk away for the situation. The claimant reported that she is doing well at her job despite occasional internal conflicts between the strict ABA guidelines and she has a good relationship with her new case manager. Treating psychiatrist Dr. Chadha noted that the claimant has been using her coping skills instead of medications (Exhibit 12F/116-117).

Lastly, an interviewer from the Field Office in March 2018 observed and noted that the claimant had no problems with understanding, coherency, concentrating, talking and answering questions. The claimant did not exhibit any signs of delay or difficulty in her attention or focus (Exhibit 17E).

In December 2019, treating psychiatrist Dr. Chadha indicated that the claimant's examination was within normal limits; she was able to follow the flow of conversation with good attention. The claimant is able to work, perform self-care and care for the needs of her children. The claimant has

15

1

excellent social functioning skills, excellent concentration, and excellent
adaptation to work. Dr. Chadha noted that the claimant has significantly
progressed since 2014 and has benefitted from therapy and medications
(Exhibit 17F/4-7).

2

3

4

At a subsequent hearing in May 2020, the claimant testified that she has
returned to work, working part-time as a behavioral therapist aid, working
with autistic children. The claimant indicated that she had been applying
for jobs since she graduated from college.

5

6

Thus, the records showed from the application date of April 30, 2014
through September 2019 (the date the claimant earned less than substantial
gainful activity), the claimant condition was well controlled when she
consistently took her medication and she was capable of completing
college with a GPA of 3.7 (Exhibits 4F/1; 5F/9-11, 17).

7

8

9

CAR 339-41.

10

Plaintiff first argues, generally, that the ALJ "failed to identify specifically which

11

statements were unsupported [by the medical evidence] and failed to explain why." ECF No. 16,

12

pg. 14. Next, Plaintiff contends the ALJ erred by relying on periods of time when Plaintiff's

13

mental health symptoms were improved. See id. at 14-18. Next, Plaintiff takes issue with the

14

ALJ's reliance on Plaintiff's ability to attend college through 2015 and earn a bachelor's degree.

15

See id. at 18-19. Finally, Plaintiff argues that the ALJ erred in relying on evidence that Plaintiff

16

at times failed to take her medications. See id. at 19-20.

17

A.      **Identification and Explanation of Evidence**

18

According to Plaintiff:

19

The ALJ first states that Fillmore's statements about intensity,
persistence, and limiting effects of symptoms are "inconsistent with
treatment records and activities of daily living." AR 334. The ALJ
proceeds to summarize medical evidence. AR 334-341. In doing so, the
ALJ failed to identify specifically which statements were unsupported and
failed to explain why. See Brown-Hunter v. Colvin, 806 F.3d 487, 949
(9th Cir. 2015) (finding error where the ALJ stated that the testimony was
unsupported then summarized evidence without identifying specifically
which statements were unsupported and why).

20

21

22

23

24

ECF No. 16, pg. 14.

25

In Brown-Hunter, the Ninth Circuit stated that the court should not "fault the

26

agency for explaining its decision with 'less than ideal clarity.'" 806 F.3d at 492 (quoting

27

Treichler v. Comm'r of Soc. Sec., 775 F.3d 1090, 1099 (9th Cir. 2014)). The court nonetheless

28

concluded that "we still demand that the agency set forth the reasoning behind its decisions in a

1    way that allows for meaningful review." 806 F.3d at 492. The Ninth Circuit has also stated that a

2    finding regarding the weight given to a claimant's testimony "must be sufficiently specific to

3    allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on

4    permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain."

5    Bunnell, 947 F.3d at 345-46.

6          In Treichler, the Ninth Circuit rejected an ALJ's evaluation of the claimant's

7    subjective statements and testimony based only on a "single general statement that 'the claimant's

8    statements concerning the intensity, persistence, and limiting effects of these symptoms are not

9    credible to the extent they are inconsistent with the above residual functional capacity

10   assessment.'" 775 F.3d at 1102-03. The court concluded the ALJ in Brown-Hunter "made the

11   same identical conclusory statement and likewise failed to identify specifically which of Brown-

12   Hunter's statements she found not credible and why." 806 F.3d at 493. The court added: "Our

13   review of the ALJ's written decision reveals that she . . . simply stated her non-credibility

14   conclusion and then summarized the medical evidence supporting her RFC determination." Id. at

15   494. The Ninth Circuit concluded in Brown-Hunter that, to avoid legal error, the ALJ must

16   identify the statements and testimony being assigned less weight and link that testimony to

17   particular parts of the record supporting the determination. See id.

18         Here, the ALJ summarized Plaintiff's statements and testimony and then provided

19   a lengthy and detailed summary of the longitudinal medical record. See CAR 334-38. The Court

20   has thoroughly reviewed each of the ALJ's references to specific portions of the medical record

21   over time and does not find any link between such references and Plaintiff's statements or

22   testimony. Given this defect, it is impossible to determine why the ALJ might have thought a

23   particular portion of the medical record undermined any specific part of Plaintiff's statements or

24   testimony. It is also thus impossible to engage in any meaningful review. For these reasons, the

25   Court agrees with Plaintiff that the ALJ's analysis of her statements and testimony is flawed, at

26   least to the extent it relies on purported inconsistencies with the medical record, which the ALJ in

27   this case has not identified. The Court will nonetheless consider whether other reasons cited by

28   the ALJ support the ALJ's evaluation of Plaintiff's statements and testimony.

1          **B.**     <u>**Reliance on Periods of Improved Symptoms**</u>

2          Plaintiff asserts:

3               The ALJ cites to various periods where Fillmore was either doing
           well or improved with treatment. AR 335-341. As the Ninth Circuit has
4          acknowledged, in cases involving mental health, "[c]ycles of improvement
           and debilitating symptoms are a common occurrence." *Garrison v. Colvin*,
5          759 F.3d 995, 1017 (9th Cir. 2014) (citation omitted). This is particularly
           true where the underlying impairment is a bipolar disorder. See *Buck v.*
6          *Colvin*, 540 Fed. Appx. 772, 773 (9th Cir. 2013) quoting *Agyeman v.*
           *I.N.S.*, 296 F.3d 871, 881 (9th Cir. 2002) ("Bipolar disorder is a severe
7          psychiatric illness marked by episodes of mania and depression,
           impairment of functioning—both cognitive and behavioral, and is
8          frequently complicated by psychotic symptoms (e.g. delusions,
           hallucinations, and disorganized thinking).") (emphasis in original).
9               Although this record shows ups and downs early-on, it was not
           until much later that Fillmore figured out how to use the skills she
10         developed with her psychiatrist and counselor to have a level of sustained
           improvement. AR 301. . . .
11
           ECF No. 16, pgs. 14-15.
12

13         Plaintiff then outlines the following timeline of cycles of improvement and decline

14   between May 2014 and August 2018:

15               May 2014          Plaintiff presented with cooperative attitude but
                                   poor energy and dysphoric mood.  Plaintiff's
16                                 memory was fair, but her remote memory was poor
                                   and she had grandiose thought content.  ECF No.
17                                 16, pg. 15 (citing CAR 233-34).

18               June 2014         Plaintiff reported to her doctor that she gets angry
                                   easily, has mood swings, and experiences "road
19                                 rage."  Plaintiff also reported difficulty
                                   concentrating, especially in class when she would
20                                 "zone out" during lectures.  Plaintiff presented with
                                   normal eye contact, but with a labile mood and
21                                 pressured and loud speech.  Plaintiff was also
                                   intermittently tearful.  Her thought content was
22                                 tangential, hard to follow, and difficult to redirect.
                                   ECF No. 16, pg. 15 (citing CAR 240-41).
23
                 July 2014         Plaintiff presented as disheveled with fast and
24                                 slightly pressured speech.  Her thought content was
                                   logical and coherent, but she "rambled and needed
25                                 frequent redirection" at times.  Plaintiff reported
                                   occasionally getting violent.  While she was taking
26                                 Abilify, Plaintiff reported that it caused daily
                                   headaches.  ECF No. 16, pg. 15 (citing CAR 251).
27

28   / / /

| | | |
|---|---|---|
| December 2014 | Plaintiff reported getting good grades but that it took her three to six extra hours to complete assignments compared to her peers.  Plaintiff presented with a happy yet anxious affect within a normal range.  Her thought content was circumstantial with slightly disorganized exchange.  ECF No. 16, pg. 15 (citing CAR 280). | |
| September 2015 | Plaintiff reported that she had stopped taking her medication – Geodon – one week prior because it made her very tired, and the sleepiness affected her ability to drive and concentrate and made her fall asleep in class.  Plaintiff's medication was switched to Risperidone.  ECF No. 16, pg. 16 (citing CAR 270-71). | |
| November 2015 | Plaintiff reported hearing intermittent voices telling her to harm herself.  While Plaintiff reported that her mood was fine, she exhibited an anxious, depressed, and frustrated mood.  Plaintiff's doctor reported that Plaintiff's borderline personality and mood disorders were poorly controlled and increased Plaintiff's dosage of Risperidone.  Despite the increased dosage, Plaintiff presented at her next appointment as irritable and agitated.  Plaintiff endorsed impulsive thoughts, specifically around spending large amounts of money.  Plaintiff also reported difficulty finding a job due to poor concentration and straying off-topic during interviews.  ECF No. 16, pg. 16 (citing CAR 266-68). | |
| April 2016 | Plaintiff states she "returned to treatment" in April 2016 "after missing appointments due to scheduling difficulties."  Plaintiff reported marked irritability, overthinking, unprovoked anger, and difficultly concentrating since running out of Risperidone two weeks earlier.  She continued to endorse impulsive thoughts and reported spending $1,100.00 on a computer "because she felt like she needed to buy something."  ECF No. 16, pg. 16 (citing CAR 713). | |
| June 2016 | Plaintiff reported that she recently stopped taking Risperidone because it made her extremely sleepy and restless."  Plaintiff reported that, since discontinuing her medication, she experienced a quick temper and had cut her wrist "to cope with emotional pain."  ECF No. 16, pgs. 16-17 (citing CAR 767). | |
| September 2016 | Plaintiff reported that medications Geodon, Latuda, and Abilify "didn't work."  She also reported that she felt very tired on Risperidone.  Plaintiff reported that she ran out of medication "because her case was prematurely closed after her caseworker left." | |

| | | |
|---|---|---|
| 1 | | Plaintiff demonstrated impulsive spending, stating that she recently purchased a new Jeep "on a whim" |
| 2 | | even though she could not drive it.  Plaintiff's |
| 3 | | doctor recommended re-starting Plaintiff on a low dose of Risperidone.  ECF No. 16, pg. 17 (citing |
| 4 | | CAR 763-65). |
| 5 | November 2016 | Plaintiff reported cycling between depression and hypomania.  She also reported that her medication |
| 6 | | helped her "stay regulated."  Plaintiff reported that Geodon, Latuda, and Abilify were ineffective and |
| 7 | | expressed that she was "scared to death" to try Lithium due to potential side effects.  Plaintiff's |
| 8 | | doctor stated that "current compliance does not seem to be an issue as she only reports missing x3 |
| 9 | | doses per month."  ECF No. 16, pg. 17 (citing CAR 780-81). |
| 10 | February 2017 | Plaintiff reported that she had a physical altercation with her rather-in-law, which resulted in Plaintiff |
| 11 | | having to "take him down to the ground."  Plaintiff reported that she was happy with the current dose of |
| 12 | | Risperidone "because it does not make her drowsy," but Plaintiff wanted "more control" over her |
| 13 | | symptoms, which vary on different days.  ECF No. 16, pgs. 17-18 (citing CAR 793). |
| 14 | | |
| 15 | March 2017 | Plaintiff reported changes to her sleep pattern, resulting in decreased concentration and forgetting |
| 16 | | simple tasks in caretaking for her son.  She attributed the change to an impending divorce.  ECF |
| 17 | | No. 16, pg. 18 (citing CAR 802-03). |
| 18 | October 2017 | Plaintiff reported that she was not taking any medication because she was pregnant.  She did, |
| 19 | | however, discuss increasing her therapy visits with her therapist at CalWorks.  ECF No. 16, pg. 18 |
| 20 | | (citing CAR 827). |
| 21 | May 2018 | Plaintiff had her baby.  ECF No. 16, pg. 18 (citing CAR 949). |
| 22 | August 2018 | Plaintiff reported improved anxiety and depression |
| 23 | | symptoms without medication.  ECF No. 16, pg. 18 (citing CAR 955). |
| 24 | Plaintiff concludes: | |

26  Fillmore did what the taxpayers would hope her to do, which is work hard with her providers and eventually return to the workforce. However, during the closed period of disability requested, and contrary to the ALJ's decision that Fillmore's statements are inconsistent with the record, this record fails to show a sustained level of improvement until the

28  / / /

1     later part of 2018 and early 2019, consistent with Fillmore's return to
      work.
2
      ECF No. 16, pg. 18.
3

4     In Garrison, the Ninth Circuit held:

5           As we have emphasized while discussing mental health issues, it is error
            to reject a claimant's testimony merely because symptoms wax and wane
6           in the course of treatment. Cycles of improvement and debilitating
            symptoms are a common occurrence, and in such circumstances it is error
7           for an ALJ to pick out a few isolated instances of improvement over a
            period of months or years and to treat them as a basis for concluding a
8           claimant is capable of working.

9           759 F.3d at 1017 (citing Holohan v. Massanari, 246 F.3d 1195, 1205 (9th
            Cir. 2001)).
10

11    The court stated that reports of improvement in the context of mental health impairments "must

12    be interpreted with an understanding of the patient's overall well-being and the nature of her

13    symptoms." Id. (citing Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1200-01 (9th Cir. 2008)).

14    The Ninth Circuit added that mental health impairments must also be evaluated "with an

15    awareness that improved functioning. . .does not always mean that a claimant can functional

16    effectively in a workplace." Id. (citing Hutsell v. Massanari, 259 F.3d 707, 712 (9th Cir. 2001)

17    ("We also believe that the Commissioner erroneously relied too heavily on indications in the

18    medical record that Hutsell was `doing well,' because doing well for the purposes of a treatment

19    program has no necessary relation to a claimant's ability to work or to her work-related functional

20    capacity")); see also Scott v. Astrue, 747 F.3d 734, 739-40 (7th Cir. 2011).

21          Plaintiff's argument is well-taken.  A review of the hearing decision, Plaintiff's

22    timeline, as well as the record as a whole reflects what one would expect in a case involving

23    bipolar disorder and depression – waxing and waning symptoms.  A few examples suffice to

24    illustrate the point.  In May 2014, Plaintiff reported poor energy.  See CAR 233-34.  In June

25    2014, Plaintiff reported that she gets angry and has mood swings.  See id. at 240-41.  In July

26    2014, Plaintiff presented as disheveled with fast speech, and rambled thought content.  See id. at

27    251.  By December 2014, as the ALJ noted, Plaintiff reported that she was doing better.  See id.

28    at 334 (citing Exhibit 5F).  But by November 2015, as the ALJ also noted, Plaintiff's doctor

1    opined that Plaintiff's symptoms were poorly controlled.  See id. at 335 (citing Exhibit 5F).  In

2    November 2015, Plaintiff also reported hearing voices telling her to harm herself.  See id. at 266-

3    68.  In April 2016, Plaintiff reported impulsive spending, unprovoked anger, and trouble

4    concentrating.  See id. at 713.  The record reflects that, for the remainder of 2016, Plaintiff's

5    providers attempted medication adjustments to deal with side effects.  See id. at 763-65, 767, 780-

6    81.  Given the up-and-down nature of Plaintiff's mental health symptoms over time, the ALJ's

7    references to periods of time when Plaintiff has doing well are not particularly instructive and do

8    not support an adverse finding as to the weight to be afforded Plaintiff's statements and

9    testimony.

10           **C.**      **Plaintiff's Ability to Attend College and Earn a Degree**

11                  Plaintiff argues:

12                        The ALJ refers to Fillmore's ability to attend college through 2015
             to reject Fillmore's symptom testimony. AR 339-341. Elsewhere, the ALJ
13           refers to Fillmore's ability to interact with children, her mother, her
             boyfriend, go to the gym, and attend a party. AR 342. Courts have
14           repeatedly warned that ALJ's must be particularly cautious in concluding
             that daily activities are inconsistent with symptom testimony because
15           impairments that would unquestionably preclude work would often be
             consistent with doing more than merely resting in bed all day. *Garrison*,
16           759 F.3d at 1016.
                          Fillmore's description of her ability to attend college do not
17           demonstrate an ability to engage in full-time work. Fillmore testified that
             she had a doctor's note which allowed her to sit in front during lectures.
18           AR 305. She notified her professors about her limitations and was able to
             receive extended office hours. AR 305. Fillmore occasionally "lashed out"
19           on other students and would take breaks from class. AR 300.
                          Medical records from June 2014 indicate difficulty concentrating
20           while in class. AR 240. In December 2014, she reported getting good
             grades, but needed three to six additional hours to complete assignments
21           when compared to her peers. AR 280. In September 2015, it was noted
             that she would fall asleep in class due to her medication. AR 270.
22           Contrary to the ALJ's conclusion, Fillmore's ability to attend college does
             not demonstrate that she is capable of greater ability to function in a full-
23           time workplace. The ALJ's reasoning is unsupported by substantial
             evidence.
24
                    ECF No. 16, pgs. 18-19.
25

26   / / /

27   / / /

28   / / /

22

Regarding reliance on a claimant's daily activities to discount testimony of disabling pain, the Social Security Act does not require that disability claimants be utterly incapacitated.  See Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989).  The Ninth Circuit has repeatedly held that the ". . . mere fact that a plaintiff has carried out certain daily activities . . . does not . . .[necessarily] detract from her credibility as to her overall disability."  See Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (quoting Vertigan v. Heller, 260 F.3d 1044, 1050 (9th Cir. 2001)); see also Howard v. Heckler, 782 F.2d 1484, 1488 (9th Cir. 1986) (observing that a claim of pain-induced disability is not necessarily gainsaid by a capacity to engage in periodic restricted travel); Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984) (concluding that the claimant was entitled to benefits based on constant leg and back pain despite the claimant's ability to cook meals and wash dishes); Fair, 885 F.2d at 603 (observing that "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication").  Daily activities must be such that they show that the claimant is ". . .able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting."  Fair, 885 F.2d at 603.  The ALJ must make specific findings in this regard before relying on daily activities to find a claimant's pain testimony not credible.  See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

The Court agrees with Plaintiff that the ALJ's references to Plaintiff's ability to attend college and earn a degree during the closed period of alleged disability provides little to no justification to discount Plaintiff's statements and testimony.  As Plaintiff notes, she testified at the 2020 hearing following remand that she had to sit in the front of the class near the door "in case there was anything."  CAR 305 (hearing testimony).  She also let her professors know that she had difficulty concentrating and "they all were very accommodating for me and basically told me whatever I need is fine."  Id.  Some professors offered Plaintiff extended office hours "to help me because I was falling behind."  Plaintiff further testified that, at times, she would recall the professor saying "good morning" at the start of class and the next thing she remembers is the professor saying "okay, class is over."  Id.  Plaintiff stated that she would, at times, lash out at

1    other students because she felt they were disturbing her focus.  See id. at 300-01.  In December

2    2014, Plaintiff reported to her medical provider that she required three to six additional hours to

3    complete projects due to difficulty concentrating.  See id. at 280.

4           These limitations on Plaintiff's ability to attend college classes do not necessarily

5    describe someone capable of maintaining full-time competitive employment during the period

6    Plaintiff was in school.  To the contrary, they indicate significant limitations if translated to a

7    work setting.  While the ALJ has identified some work-related abilities associated with Plaintiff

8    attending college and earning her degree during the closed period (such as ability to concentrate,

9    albeit limited), the ALJ has not explained how those abilities translate to full-time work given the

10   limitations reflected in the record.

11          **D.**     **Noncompliance with Medication**

12          According to Plaintiff:

13          The ALJ next refers to evidence of Fillmore not taking her

14   medication. AR 339-340. A claimant's failure to comply with prescribed
     treatment may be a good reason for rejecting their testimony unless there

15   are good reasons for the failure. *Molina v. Astrue*, 674 F.3d 1104, 1113
     (9th Cir. 2012) (citation omitted). The ALJ's reliance on noncompliance

16   fails to consider the nature of Fillmore's underlying impairments. In
     *Brewes v. Comm'r of Soc. Sec. Admin.*, the Ninth Circuit stated that a

17   claimant's difficulty following through with treatment was "entirely
     consistent" [with] their underlying mental impairments which include

18   bipolar disorder, depression, anxiety, and agoraphobia. 682 F.3d 1157,
     1164 (9th Cir. 2012) (stating that).

19          Dr. Layton testified at the hearing that nearly half of his patients
     with bipolar disorder have issues with compliance. AR 313. According to

20   Dr. Layton, when patients with bipolar disorder are younger, they tend to
     quit medication, but when they are older, they realize the medication

21   helps, so their insight and judgment improves. AR 313. Fillmore was 21
     years old on the application date here. As time passed, she figured out how

22   to manage her symptoms and eventually returned to work. Her failure to
     take medication is not inconsistent with the expectation given her

23   underlying bipolar disorder.
            Moreover, as demonstrated above, Fillmore tried several different

24   types of medication, including Geodon, Latuda, and Abilify, which were
     ineffective. AR 780. She was not interested in taking Lithium because she

25   was "scared to death" of the side effects. AR 780. She stuck with
     Risperidone even though the medication made her tired. AR 763. In

26   November 2016, Fillmore discussed concerns of missing doses, but her
     provider noted that "current compliance does not seem to be an issue as

27   she only reports missing 3 doses per month." AR 781. Given Fillmore's
     underlying impairments, the types of medication she cycled through, Dr.

28   Layton's testimony, and Fillmore's eventual ability to figure out how to
     manage her symptoms, the ALJ's consideration of non-compliance to

                                                24

1    reject Fillmore's symptom testimony lacks the support of substantial
     evidence.
2
     ECF No. 16, pgs. 19-20.
3

4          Again, the Court finds Plaintiff's argument persuasive.  In <u>Brewes</u>, the Ninth

5    Circuit observed that difficulty following through with recommended treatment is "entirely

6    consistent" with the claimant's impairments, which included bipolar disorder, anxiety disorder,

7    and panic disorder with agoraphobia.  682 F.3d at 1160, 1164.  Here, as Plaintiff observes, Dr.

8    Layton, a medical expert who testified at the hearing, stated that half of patients with bipolar

9    disorder have difficulty with compliance.  Moreover, as Plaintiff's doctor noted in November

10   2016, Plaintiff's compliance "does not seem to be an issue. . . ."  CAR 780-81.  Given the

11   foregoing, the Court finds that the ALJ's reliance on Plaintiff's occasional non-compliance with

12   medication is not a sufficient reason to discount Plaintiff's statements and testimony.  While the

13   record certainly indicates times when Plaintiff was not taking her medication and that her

14   condition worsened during these times, the record also reflects the reasons Plaintiff stopped

15   prescribed medication, specifically unwanted side-effects of certain dosages of Risperidone as

16   well as her pregnancy.  The record shows that Plaintiff was active in her treatment and, with

17   respect to medications, worked with her doctors to adjust dosages and switch medications when

18   appropriate.  Eventually, Plaintiff was able to find the right combination of type and dosage of

19   medication and therapy to control her symptoms to the point where she was able to return to the

20   workforce.

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

# IV.  CONCLUSION

For the foregoing reasons, this matter will be remanded under sentence four of 42 U.S.C. § 405(g) for further development of the record and/or further findings addressing the deficiencies noted above.

Accordingly, IT IS HEREBY ORDERED that:

1.    Plaintiff's motion for summary judgment, ECF No. 16, is granted;

2.    Defendant's motion for summary judgment, ECF No. 17, is denied;

3.    The Commissioner's final decision is reversed and this matter is remanded for further proceedings consistent with this order; and

4.    The Clerk of the Court is directed to enter judgment and close this file.

Dated:  September 16, 2021

_____
DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE